**A & H SPORTSWEAR CO., INC. and Mainstream Swimsuits, Inc., Plaintiffs and Counterclaim–Defendants,**

v.

**VICTORIA'S SECRET STORES, INC., and Victoria's Secret Catalogue, Inc., Defendants and Counterclaimants.**

### No. CIV. 94–7408.

United States District Court, E.D. Pennsylvania.

July 29, 1999.

---

Arthur H. Seidel, Stephen J. Meyers, Ronald N. Weiders, Philadelphia, PA, Norman Seidel, Easton, PA, for plaintiffs.

Frank J. Colucci, Richard P. Jacobson, New York City, Lillian E. Benedict, David I. Bookspan, H. Robert Feibach, Philadelphia, PA, for defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

### I. BACKGROUND

This action was filed pursuant to 15 U.S.C. §§ 1114, 1125(a) ("Lanham Act") and the Pennsylvania Antidilution Law, 54 Pa.C.S.A. § 1124. Plaintiffs, A & H Sportswear Co., Inc. and Mainstream Swimsuits (together "A & H"), allege that Defendants, Victoria's Secret Stores, Inc. ("VS Stores") and Victoria's Secret Catalogue, Inc. ("VS Catalogue") (together "VS"), are infringing their trademark. Plaintiffs specifically claim that their MIRACLESUIT trademark on swimwear is being infringed by THE MIRACLE BRA line of lingerie and swimwear products, made by the Defendants. In our order of October 20, 1995, we granted Defendants' motion for separate trials on the issues of liability and damages.

From October 25 to November 3, 1995, we held a two-week non-jury trial to determine issues of liability. We issued a decision on May 24, 1996, pursuant to Fed. R.Civ.P. 52(a), concluding that: (1) Plaintiffs failed to show a likelihood of confusion with respect to Defendants' use of its mark on lingerie, but (2) Plaintiffs established a possibility of confusion necessary for relief with respect to Defendants' use of mark on swimwear.[1] See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc., 926 F.Supp. 1233 (E.D.Pa.1996) ("A & H Sportswear I"). We also made extensive Findings of Fact pursuant to Fed.R.Civ.P. 52(a), based on numerous trial exhibits, trial depositions, witness testimony, some of which was filed under seal due to the commercially sensitive nature of the information. See id. at 1235–1254.[2]

After determining that Plaintiffs had met their burden of establishing a possibility of confusion between THE MIRACLE BRA and the MIRACLESUIT trademarks in the swimwear market, we proceeded to determine the appropriate relief for the Plaintiffs. We found that Plaintiffs were entitled to: (1) monetary relief in the form of a reasonable royalty on Defendants' sales; and (2) an injunction requiring VS not to use THE MIRACLE BRA trademark with respect to swimwear unless it used a disclaimer and paid the swimwear manufacturer a periodic reasonable royalty. See A & H Sportswear Inc. v. Victoria's Secret Stores, 967 F.Supp. 1457, 1482–83 (E.D.Pa.1997) ("A & H Sportswear II"). We again made numerous Findings of Fact that were relevant for the trial on the issue of damages. See id. at 1462–67.[3]

Defendants appealed our judgment that THE MIRACLE BRA swimwear infringes Defendants' MIRACLESUIT trademark, arguing that this court applied an erroneous standard of law. Plaintiffs filed a cross-appeal contending that this court clearly erred in failing to find a likelihood of confusion between THE MIRACLE BRA mark on lingerie and Plaintiffs' MIRACLESUIT mark. With respect to the issue raised on Plaintiffs' cross-appeal, the Third Circuit affirmed this court's decision that Plaintiffs failed to show that there was a likelihood of confusion between THE MIRACLE BRA mark on lingerie and the MIRACLESUIT mark.[4] See A&H Sport-

1. At that time, we also concluded that Defendants use of a mark containing MIRACLE for its goods did not violate Plaintiffs' rights under 54 Pa.C.S.A. § 1124, the Pennsylvania Antidilution law. See A & H Sportswear I, 926 F.Supp. at 1265.

2. The Findings of Facts made for the liability phase of the trial are hereinafter referred to as: "Facts I at ¶ __."

3. The Findings of Fact made for the damages phase of the trial are hereinafter referred to as: "Facts II at ¶ __."

4. We also note that the Third Circuit affirmed our finding, see A & H Sportswear I, 926

*wear Inc. v. Victoria's Secret Stores,* 166 F.3d 191 (3d Cir.1999) ("A & H Sportswear III").

However, with respect to the issue raised by Defendants' appeal, the Third Circuit reversed our decision finding that there is a possibility of confusion between THE MIRACLE BRA mark on swimwear and the MIRACLESUIT mark. *See A&H Sportswear Co. v. Victoria's Secret Stores,* 166 F.3d 197 (3d Cir.1999) ("A & H Sportswear IV"). The Third Circuit held that the possibility of confusion standard applied by this court was clearly erroneous when examining trademark infringement for directly competing goods. *See id.* at 206. The Third Circuit then remanded this case to our court with the instruction that we must "conduct the appropriate analysis of the likelihood of confusion under the standards set by the Lanham Act and in the relevant precedent." *Id.* Moreover, the Third Circuit stated "[i]f the District Court believes that such a finding can be made based on the record before it, it is free to do so." *Id.* at 210.

By our order dated March 31, 1999, we requested that both parties submit further briefing on the issue of liability only. We declined to allow the parties to brief on the issue of damages at that time.[5] *See* Order 3/31/99. Presently before the court are:

1. Plaintiffs' Memorandum Concerning: (1) The Appropriate Analysis and the Relevant Precedent Under the Likelihood of Confusion Standard of the Lanham Act for Directly Competing Goods; and (2) Whether the Interaction Between THE MIRACLE BRA for Swimwear and the MIRACLESUIT for Swimwear Implicates the Doctrine of Reverse Confusion filed on April 21, 1999; and

2. Victoria's Secret's Memorandum upon Remand Demonstrating No Likelihood of Confusion, Either Forward or Reverse, Exists Between THE MIRACLE BRA and MIRACLESUIT in the Swimwear Market filed on May 18, 1999.

After reviewing the record before us, we find that Plaintiffs have failed to show a likelihood of confusion between their MIRACLESUIT mark and the Defendants' THE MIRACLE BRA mark as applied to swimwear. Furthermore, we find that there is no likelihood of reverse confusion between the MIRACLESUIT mark and THE MIRACLE BRA mark because the interaction of the two marks does not implicate the doctrine of reverse confusion.

## II. FACTS

On remand, we were given the option of making a finding on the likelihood of confusion issue either based on the record before us or by allowing further discovery in this case. *See A & H Sportswear IV,* 166 F.3d at 210. The choice was left to the sound discretion of this court. *Id.* We determined that additional discovery is not necessary because the record contains extensive findings of fact based on numerous trial exhibits, trial depositions and witnesses. Subsequently, we denied a request by the Plaintiffs to supplement the record by further financial discovery. *See* Order 3/31/99.

As the facts have been presented in multiple decisions, *see, e.g., A & H Sportswear I,* 926 F.Supp. at 1235–54; *A & H Sportswear II,* 967 F.Supp. at 1462–67, we will presently provide only a brief overview of the facts in the record. Plaintiffs, A &

---

F.Supp. at 1269, that Defendants have not violated the Pennsylvania Antidilution statute, 54 Pa.C.S.A. § 1124. *A & H Sportswear III,* 166 F.3d at 197 n. 2.

**5.** The Third Circuit also vacated the remedy ordered by this court. *See A & H Sportswear IV,* 166 F.3d at 207. In particular, while making no comment as to liability, it rejected

our awarding of royalty damages to the Plaintiffs for a mere showing of infringement. *See id.* at 208–209. However, while we expected to address the issue of damages in a separate phase of briefing, after the following analysis, we now find that it is unnecessary to address the issue of a remedy as discussed below, *see* Section IV.

H, are a corporation organized under the laws of Pennsylvania. Facts I at ¶ 1. A & H manufactures women's swimwear, including the MIRACLESUIT swimsuit.[6] *See id.* A & H's MIRACLESUIT product line is mostly one-piece swimsuits which offer body control in order to make the wearer look slimmer. *See id.* at ¶¶ 3, 14. The MIRACLESUIT construction emphasizes horizontal control and vertical stretch, and all swimsuits have lower torso control. *See id.* at ¶¶ 16, 47. A & H's swimsuits also incorporate a variety of bras, including push-up bras, underwires, padded bras, shaping bras, and unconstructed bras. *See id.* at ¶¶ 3, 14. A & H's MIRACLESUIT has a hang-tag bearing the words "MIRACLESUIT® by SwimShaper®—Look ten pounds lighter in 10 seconds. The ten seconds it takes to slip it on." *See id.* at ¶¶ 3, 55.

Defendant, VS Stores, sells lingerie, swimwear, and assorted intimate apparel for women in nationwide retail stores. *See id.* at ¶ 6. Defendant, VS Catalogue, is a mail-order business that sells a similar yet broader range of products than VS Stores. *See id.* at ¶ 6. Both VS Stores and VS Catalogues have offered THE MIRACLE BRA as a one-piece swimsuit and a two-piece bikini.[7] *See id.* at ¶ 33. While a few of THE MIRACLE BRA swimsuits have lower torso control, the primary feature of such swimsuits is cleavage enhancement by angled underwires, push-up pads, and adjustable pads. *See id.* at ¶¶ 15, 47. THE MIRACLE BRA is identified with a hang-tag and/or sewn-in label bearing the

THE MIRACLE BRA name and Victoria's Secret housemark. *See id.* at ¶ 19.

A & H received its federal trademark registration of the MIRACLESUIT mark for swimwear on October 27, 1992. *See id.* at ¶¶ 1, 21. On December 9, 1992, VS Stores' filed an application for THE MIRACLE BRA mark for bras. *See id.* at ¶ 25. During the trademark search conducted by VS Stores' counsel, the search revealed numerous "miracle" trademarks, including A & H's MIRACLESUIT mark. *See id.* at ¶ 24. VS Stores received its registration for THE MIRACLE BRA bra on August 19, 1994. *See id.* at ¶ 25. VS Stores has generally assumed a primary role in naming new products and no one who played a role in approving THE MIRACLE BRA name had heard of the MIRACLESUIT or A & H.[8] *See id.* at ¶ 26.

In 1994, Defendants chose to develop a swimwear product with THE MIRACLE BRA name. The idea to put THE MIRACLE BRA trademark and feature (enhanced cleavage) into a bikini first came from VS Catalogue as a direct result of THE MIRACLE BRA's success. *See id.* at ¶ 33. Applying THE MIRACLE BRA mark to swimwear was a "natural" extension of the use of the mark on bras. *See id.* at ¶ 45. VS Stores termed the decision to broaden the use of the name THE MIRACLE BRA into swimwear as "instinctive"—a way to expose the enhanced-cleavage attribute to potential customers in as many ways as possible.[9] *See id.* at ¶ 42. Thus, in the latter half of 1994, VS Stores applied for a trademark registration for THE MIRACLE BRA for "swim-

6. Swimsuit items represent 95% of A & H's products. *See id.* at ¶ 14.

7. VS Stores only offered THE MIRACLE BRA swimwear for a limited time from 1994 to 1995. *See id.* at ¶ 34. In 1997, VS Stores stated that it had no intention of marketing THE MIRACLE BRA swimwear in its stores that year. *See* Facts II at ¶ 27.

8. Prior to VS Store's adoption and use of THE MIRACLE BRA mark, VS Catalogue had purchased A & H's swimsuits for sale in the VS Catalogue. *See id.* at ¶ 28. VS Catalogue

has made no further purchases of A & H's swimsuits since the MIRACLESUIT swimsuits were purchased in 1992. *See id.* ¶ 30. No one from the VS Catalogue was involved in the selection of THE MIRACLE BRA mark. *See id.* at ¶ 23.

9. In general, VS Stores may act with regard to a product without VS Catalogue's knowledge or vice versa. *See id.* at ¶ 9. There is no set method for communicating between VS Stores and VS Catalogue or between the two companies' CEOs. *See id.*

suits, bathing suits, and bikinis." *See id.* at ¶¶ 34, 48.[10] VS Stores' first use of THE MIRACLE BRA mark with regard to swimwear occurred as a test in ten stores in November 1994. *See id.* at ¶ 34. VS Catalogue's first marketing of THE MIRACLE BRA bikini was in November of 1994. *See id.* at ¶ 33.

Neither VS Stores nor VS Catalogue was aware of any objection by A & H until A & H commenced this civil action on December 8, 1994. *See id.* at ¶¶ 31, 74. A & H was aware of the Defendants' use of THE MIRACLE BRA mark with swimwear for one month when it filed its complaint. *See id.* at ¶ 74. On February 27, 1995, the Patent and Trademark Office ("PTO") refused VS Stores' application for registration of THE MIRACLE BRA bikini on the basis of A & H's prior registration of MIRACLESUIT swimwear. *See id.* at ¶ 36. Although the PTO rejected THE MIRACLE BRA registration for swimwear, VS Catalogue never made plans to discontinue the use of THE MIRACLE BRA mark on swimwear. *See id.* at ¶ 33. Only in 1997 did VS Catalogue begin to publish a disclaimer when marketing THE MIRACLE BRA swimwear. Facts II at ¶ 23.[11]

The MIRACLESUIT swimsuit is targeted towards women from ages "19 to infinity" who can afford to buy a "premium product" that is "pretty" and "shapes and contours the figure comfortably." *See id.* at ¶ 38. Defendants also target women ages 18 to 50 and promote an image which is sensuous, glamorous and luxurious. *See id.* at ¶ 39. Moreover, both the MIRACLESUIT and THE MIRACLE BRA swimsuits are similarly priced for over $50.00. *See id.* at ¶ 44. While the MIRACLESUIT is sold to trade buyers for department stores, specialty stores and catalogue houses, *see id.* at ¶ 38, VS Stores and VS Catalogue market THE MIRACLE BRA products exclusively through their own stores and catalogues. *See id.* at ¶ 40.[12]

In terms of advertising, A & H advertises the MIRACLESUIT via point-of-sale displays in retail stores, national consumer magazines, cooperative advertising with A & H's retailer customers, distribution of bill enclosures to department stores and distribution of catalogues and press kits to professional buyers, editors and publishers. *See id.* at ¶ 59.[13] A & H spends more

10. Neither VS Stores' nor VS Catalogue's Presidents knew if the other had performed an availability search of THE MIRACLE BRA with regard to swimwear. *See id.* at ¶ 35. Moreover, Mr. Deckop, Chief Financial Officer, had the ultimate authority to authorize trademark searches and had executed all VS Stores' trademark applications for the prior ten years. *See id.* at ¶ 25. In executing VS Stores' application for registration of THE MIRACLE BRA for swimsuits, Mr. Deckop had assumed that VS Stores' had performed a trademark search. *See id.* at ¶ 35. He testified that in executing VS Stores' application for THE MIRACLE BRA mark for swimsuits, he relied on counsel to present papers that merely required his review and signature. *See id.* at ¶¶ 25, 35.

11. In 1997, the disclaimer appeared as follows: "THE MIRACLE BRA swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLESUIT® by Swim Shaper®." *See id.* Although the positioning varied, the disclaimer often appeared in dark, black type against a light background

at the lower left corner of the actual page on which THE MIRACLE BRA swimwear collection was featured in the catalogue, just above the telephone number for placing an order. *See id.* at ¶ 24. The President of VS Catalogue stated that since there are only a few seconds in which to capture a consumer's attention, placement near the telephone number is particularly appropriate. *See id.* at ¶ 21.

12. VS Stores and VS Catalogue compete with department stores, mass merchandisers, speciality retailers, boutiques and catalogue operations. *See id.*

13. Advertisements for A & H typically show a woman wearing a swimsuit photographed from the knees up with the entire swimsuit visible. *See id.* at ¶ 58. A & H's advertisements include the MIRACLESUIT trademark, the suit's slimming feature, and the tag line, "Lose ten pounds in ten seconds/the ten seconds it takes to put the suit on." *See id.* MIRACLESUIT has been advertised with an initial letter M capitalized and the rest of the

money on advertising the MIRACLESUIT than on any other brand. *See id.* at ¶ 68. A & H has spent approximately $300,000 annually for MIRACLESUIT advertisements. *See id.* at ¶ 60. A & H has received extensive free publicity valued in excess of $1.5 million. *See id.* at ¶¶ 61–62. Moreover, A & H manufactures 4 million swimsuits, or approximately 10% of all swimsuits annually sold in the United States. *See id.* at ¶ 1. The MIRACLE-SUIT line has earned consistent positive net profits. *See id.* at ¶ 68. As of August 31, 1995, sales for 1995 represented the highest year end total since the inception of the MIRACLESUIT. *See id.* In fact, since VS Store's launch of THE MIRACLE BRA, A & H's sales of the MIRACLESUIT have steadily increased. *See id.*

THE MIRACLE BRA products, mostly lingerie products, have been advertised through in-store promotions such as photography and signs used in VS Store's windows, interiors, and press kits, as well as print and television advertisements. *See id.* at ¶¶ 63–64.[14] VS Stores spent $3.4 million in 1994 and $5 million in 1995 on all of THE MIRACLE BRA products for outside advertising, and $1 million for in-house promotion during 1994 to 1995. *See id.* at ¶ 67. VS Catalogue advertising expenditures for all of THE MIRACLE BRA products have been $4 million. *See id.* Through August of 1995, VS Store's sale of THE MIRACLE BRA swimwear from its inception was roughly $1 million, *see id.* at ¶ 69, while VS Catalogue earned $10.3 million from sales of THE MIRACLE BRA swimwear. *See id.* at ¶ 70.

## III. DISCUSSION

■ Trademark infringement is established if the plaintiff proves that: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff;

and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990). There is no dispute that Plaintiffs are the owner of a valid and legally protectable mark because the mark at issue was federally registered.

Thus, in order to succeed on a claim of trademark infringement, Plaintiffs must show that the Defendants have used a mark that "is likely to cause confusion" pursuant to sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a)(1). The Third Circuit has instructed us to "conduct the appropriate analysis of the likelihood of confusion under the standards set by the Lanham Act and in the relevant precedent." *A & H Sportswear IV,* 166 F.3d at 206. It has further advised:

> "Whether confusion is likely is proved by inference drawn from the totality of relevant facts identified and analyzed by established rules .... There are no hard and fast rules as to how much evidence of confusion is enough. Rather, when looking at the evidence the reviewing court must take into consideration the circumstances surrounding each particular case."

*Id.* at 206–207 (quoting Richard L. Kirkpatrick, *Likelihood of Confusion in Trademark Law,* § 1.8 (PLI, 1997) (internal citations omitted)).

■ Other Circuits agree that trademark infringement can only be found when the marks have the "likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green*

---

mark in lowercase letters in italicized script, and sometimes as one word with a capital M and S. *See id.* at ¶ 55.

14. Advertisements for THE MIRACLE BRA present the products name either in all capital block letters or in small capitals with the letters T, M, and B alone in upper capital letters. *See id.* at ¶ 55.

*Nursing Center*, 103 F.3d 196, 201 (1st Cir.1996); *see, e.g., Estee Lauder Inc. v. Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997); *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir.1998); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir.1995); *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir.1998); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987); *see also A & H Sportswear IV*, 166 F.3d at 210–212 (Appendix). Plaintiffs must show more than a mere possibility of confusion because confusion by consumers who are ignorant or inattentive is bound to exist no matter how careful the producer is. *See August Storck*, 59 F.3d at 618. On the other hand, proof of actual confusion is not necessarily required. *See Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir.1982).

## A. Likelihood of Confusion

Courts have considered a series of factors in analyzing whether a likelihood of confusion exists with respect to directly competing goods. While it is clear that a ten-factor test for a likelihood of confusion between marks exists for products that are not competing, *see Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978), the Third Circuit has not explicitly elucidated what kind of factors should be considered in the case of directly competing goods. *See A & H Sportswear IV*, 166 F.3d at 202. The Third Circuit has previously stated, "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Id.* (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983)); *see also Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 193 (3d Cir.1995) (applying some of the *Scott Paper* factors to determine trade dress infringement under the likelihood of confusion standard for competitors with a similar product configuration).

By drawing upon the relevant case law, a nonexhaustive list of the factors can be fashioned to determine the likelihood of confusion between competing products: (1) strength of plaintiff's mark; (2) similarity between the marks; (3) similarity of products and the degree to which they directly compete with each other; (4) marketing or advertising channels used; (5) sophistication of consumers; (6) defendant's intent in selecting the mark; and (7) incidents of actual confusion. *See, e.g., Banff Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988) (applying *Polaroid* factors to determine trademark infringement between competing goods); *Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir.1996) (applying factors to determine trademark infringement between two competing newspapers); *Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997) (same factor test applies for determining likelihood of confusion between competing and non-competing goods); *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 421–22 (6th Cir.1999) (likelihood of confusion determined by factor test for trademark infringement of competing goods); *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F.Supp.2d 834, 852 (E.D.Va.1998) (factors test for likelihood of infringement for directly competing goods); *see also Elvis Presley Enter.*, 141 F.3d at 194 (applying factors to infringement of a service mark); *Children's Factory*, 160 F.3d at 494 (applying factors to trade dress infringement involving competing toy manufacturers); *Rodeo Collection*, 812 F.2d at 1217 (test for infringement of service mark for directly competing shopping centers); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir.1998)(applying factors in a case of competing golf courses and alleged infringement of a service mark); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1384 n. 6 (9th Cir.1987) (test for trade dress infringement for competitors manufacturing antifreeze).

No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these factors. *See Pebble Beach*, 155 F.3d at 543. Instead, they are simply a guide to help determine whether confusion would be likely between the use of two contested trademarks on competing products. In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists. *See Elvis Presley Enters.*, 141 F.3d at 194. Thus, by applying these principles, we will turn to examine whether THE MIRACLE BRA mark on Defendants' swimwear products creates a likelihood of confusion with Plaintiffs' MIRACLESUIT mark on swimwear.

### 1. *Strength of the "MIRACLE" Mark* (Factor # 1)

 The strength of a mark is measured by the tendency to identify the product or services sold under the mark as emanating from a particular, although possibly anonymous, source. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979), *superseded by rule as stated in, Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033 (2d Cir.1992) (as to issue of de novo review by the appellate court). A mark's strength is specifically determined by two factors: (1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir.1994).

 In terms of assessing conceptual distinctiveness, marks are classified in categories of increasing distinctiveness as follows: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Marks that fall into the latter three categories are deemed inherently distinctive and are entitled to protection. *See id.* The validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace. *See Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 64 L.Ed. 705 (1920). However, it is perfectly acceptable to analyze the component parts as preliminary step. *See In re Hester Indus., Inc.*, 230 U.S.P.Q. 797, 798 n. 5 (T.T.A.B.1986).

In analyzing the distinctiveness of Plaintiffs' MIRACLESUIT mark, we previously found that the word MIRACLE with respect to swimwear is fanciful because it reveals nothing about the product. *See A & H Sportswear I*, 926 F.Supp. at 1259. In that decision, we cited to a Seventh Circuit case which also deemed the word MIRACLE to be fanciful.[15] *See Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir.1983). Thus, the word MIRACLE, as applied to swimwear, is considered inherently distinctive. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753; *Acxiom*, 27 F.Supp.2d at 496.

On the other hand, we previously found that the word SUIT is generic, though descriptive as to a type of apparel. *A & H Sportswear I*, 926 F.Supp. at 1258. Generic and descriptive terms are regarded as words merely descriptive of qualities, ingredients or characteristics which are already in the public domain. *See First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 896 F.Supp. 456, 461 (E.D.Pa.1995); *Jews for Jesus v. Brodsky,*

---

**15.** The difference between categories, however, is "often separated by only the finest of lines." *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852, 855 (3d Cir.1992). Upon reexamination, we find that the word MIRACLE could also be considered an arbitrary mark. Unlike other fanciful marks which are comprised of words that have been invented or

are currently out of common usage, *see Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611 (7th Cir.1965), the word MIRACLE is common in linguistic use but does not suggest nor describe the nature of Plaintiffs' product. *See Acxiom Corp. v. Axiom, Inc.*, 27 F.Supp.2d 478, 496 (D.Del.1998).

993 F.Supp. 282, 296–97 (D.N.J.), *aff'd,* 159 F.3d 1351 (3d Cir.1998) (table).

■ Overall, we find that the MIRA-CLESUIT mark ranges from suggestive to arbitrary. Although the MIRACLE-SUIT may have a weak portion, we are mindful that the composite may become a distinguishing mark even though its components individually cannot. *See California Cooler, Inc. v. Loretto Winery Ltd.,* 774 F.2d 1451, 1455 (9th Cir.1985); *see, e.g., In re Hester Indus.,* 230 U.S.P.Q. at 799 (THIGHSTIX for boneless chicken parts is suggestive rather than descriptive when taken in its entirety). As we stated earlier, assessing a mark's distinctiveness is not an "exact science" and the subtle distinctions between these categories can be slippery and elusive. *See Banff Ltd.,* 841 F.2d at 489; *McCarthy on Trademarks at Unfair Competition* § 11:12 (4th ed.1996). A suggestive mark requires a consumer to use imagination, thought, or perception to determine the character of the goods or service, while an arbitrary mark employs terms that do not directly describe or suggest any attributes of the product. *See Smith v. Ames Dep't Stores, Inc.,* 988 F.Supp. 827, 836 (D.N.J.1997), *aff'd,* 172 F.3d 860 (3d Cir.1998) (table). Plaintiffs chose the MIRACLESUIT name based on their belief that the name was "unique, dynamic, exciting, and memorable." Facts I at ¶ 22. By examining the MIRACLESUIT mark in its entirety, we believe that it does invoke consumer imagination to determine the nature and attributes of the product. Thus, we find that the MIRACLESUIT ranges from being suggestive to arbitrary, and thus, is considered inherently distinctive, affording it a high level of trademark protection.[16] *See*

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9th Cir.1979).

A mark's strength is always relative because its true relative strength cannot be determined simply by assessing its conceptual strength. A mark's commercial strength—its marketplace recognition value—must also be considered. *Versa Prods. Co.,* 50 F.3d at 203. We normally examine whether the Plaintiffs' mark is recognized by the relevant consumer class because it is significant to determining whether "the junior user tries to palm off his goods as those of the senior user." *Id.; Fisons,* 30 F.3d at 479.

■ Here, we note that Plaintiffs' MIRACLESUIT mark appears to have commercial strength. At trial, Plaintiffs did not present any concrete evidence about the consumer recognition of its MIRACLESUIT mark. *See A & H Sportswear I,* 926 F.Supp. at 1257. However, a mark's marketplace recognition is determinable, in part, through trademark-related advertising and sales. We previously concluded that since Plaintiffs engaged in substantial promotion activities, their efforts undoubtedly resulted in increased public recognition. *See id.* Not only have Plaintiffs participated in efforts to advertise the MIRACLESUIT swimsuit in various forums at the cost of approximately $300,000 annually, including national consumer magazines and swimwear industry trade publications, but the MIRACLESUIT has also garnered a large amount of free publicity by being featured or mentioned in articles and broadcasts in local and national forums because of its unique slimming features. *See* Facts I at ¶¶ 59–62. Plaintiffs' public relations expert testified that an equivalent value for the space and time

16. Evidence of third party use of similar marks on similar goods can show that a mark is relatively weak. *See General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 626–27 (8th Cir. 1987); *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir.1981). While there are numerous examples of registered trademarks for apparel, fashion and cosmetic items that utilize the

word "miracle" as part of their trade name, there appears to be no evidence that the "miracle" term has been used elsewhere in the swimwear product market. *See* Facts I at ¶¶ 51–52; *see also A & H Sportswear,* 926 F.Supp. at 1260. Thus, third-party registrations presented by the Defendants at trial do not weaken the conceptual strength of Plaintiffs' MIRACLESUIT mark.

received for all the publicity devoted to the MIRACLESUIT swimsuit would exceed $1.5 million. *See id.* at ¶ 61. Moreover, as the MIRACLESUIT is the Plaintiffs' most profitable line, they spend more on advertising it then on any other brand they manufacture. *See id.* at ¶ 68. Plaintiffs' sales of the MIRACLESUIT have also steadily increased. *Id.*

As discussed above, we find that the Plaintiffs' MIRACLESUIT is a conceptually strong mark. We also presume that Plaintiffs' mark is commercially strong based on not only Plaintiffs' promotional efforts, but also the success of Plaintiffs' MIRACLESUIT sales. Thus, on balance, we find that this factor weighs in favor of the Plaintiffs.

### 2. *Similarity of the Marks* (Factor # 2)

When determining the similarity between marks, the test is "whether the labels create the 'same overall impression.'" *Fisons,* 30 F.3d at 477 (quoting *Banff Ltd.,* 841 at 492 (citations omitted)); *see also A & H Sportswear III,* 166 F.3d at 195. Furthermore, caution should be exercised, where "[a] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it would do, but what a reasonable purchaser in market conditions would do." *Calvin Klein Cosmetics Corp. v. Lenox Lab.,* 815 F.2d 500, 504 (8th Cir.1987). The Third Circuit has stated in the context of the *Scott Paper* factors that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 293 (3d Cir.1991) (citations omitted). We presume that the similarity between the MIRACLESUIT mark and THE MIRACLE BRA mark is equivalently important for determining the likelihood of confusion between directly competing goods.

### a. *Similarity in Sight, Sound & Meaning*

In making a comparison between the MIRACLESUIT mark and THE MIRACLE BRA mark as applied to swimwear, we must examine the sound, sight and meaning of the marks. *See McCarthy, supra,* § 23:21. We previously found, after a considerable analysis, that the dominant portion of both the MIRACLESUIT and THE MIRACLE BRA marks is "miracle." *See A & H Sportswear I,* 926 F.Supp. at 1258–59. While we recognize that the dissection of the marks is generally improper, "it is not a violation of the anti-dissection rule to view the component parts of conflicting composite marks as a preliminary step on the way to an ultimate determination of probable customer reaction to the conflicting composites as a whole." *McCarthy, supra,* § 23:41; *see also Henri's Food Prods.,* 717 F.2d at 356 ("if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements").

We proceeded to remark that the overall impression created by the MIRACLESUIT swimsuit and THE MIRACLE BRA bra marks, however, were distinct because they have different meanings: "their very names they describe different products." *A & H Sportswear I,* 926 F.Supp. at 1259. The Third Circuit upheld this finding by stating that "the "descriptive terms" (such as "bra" and "suit") must be considered in assessing infringement." *A & H Sportswear III,* 166 F.3d at 195; *see generally Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1065 (3d Cir.1991).

Presently, we are concerned with the similarity between the MIRACLESUIT and THE MIRACLE BRA marks as applied to swimwear products. While we recognize that the term "bra" of THE MIRACLE BRA swimsuit does not designate the actual product, *see A & H Sportswear III,* 166 F.3d at 195, we still find that the term "bra" is descriptive for THE

MIRACLE BRA swimwear because it "identifies the particular feature of the garment where the 'miracle' is manifested." Defs.' Mem. at 11. In fact, many swimsuits incorporate bras into their design. *See* Facts I at ¶ 45. Thus, we still find in analyzing the similarity between THE MIRACLE BRA and MIRACLE-SUIT anew that the overall impression created by the marks as applied to swimwear is distinct. *See A & H Sportswear III,* 166 F.3d at 195.

Not only is there a difference in meaning between MIRACLESUIT and THE MIRACLE BRA marks, but they are somewhat distinct in sight and sound. THE MIRACLE BRA consists of three separate words, while the MIRACLE-SUIT is one word. While "the" is occasionally dropped from THE MIRACLE BRA mark, *see A & H Sportswear I,* 926 F.Supp. at 1258, we find that the overall visual impression between the marks to be somewhat distinct. Moreover, the phonetic similarity is slightly distinguished in that one consists of four syllables, MIRA-CLESUIT, while the other mark consists of five syllables, THE MIRACLE BRA. The last syllable of the respective marks also differs in phonetic sound—"bra" versus "suit." Cases which have found phonetic similarity to weigh in favor of finding of a likelihood of confusion have involved marks with a closer phonetic similarity. *See, e.g., Bell Publ'g Corp. v. Bantam Doubleday Dell Publ'g Group,* 17 U.S.P.Q.2d 1634, 1637 (E.D.Pa.1990), *aff'd,* 932 F.2d 958 (3d Cir.1991) (table) ("DELL" and "BELL" are phonetically similar); *Pocono Rubber Cloth Co. v. J.A. Livingston, Inc.,* 79 F.2d 446, 448 (3d Cir.1935) ("SUA-VELLE" and "SWAVEL" are pronounced similarly).

We generally recognize that some cases have found marks with less phonetic and visual similarity to create a likelihood of confusion. *See, e.g., Williamson–Dickie Mfg. Co. v. Davis Mfg. Co.,* 251 F.2d 924, 926–27 (3d Cir.1958) ("DICKIE DAVIS" is confusingly similar to "DICKIE'S"); *Rob-*

*ert Bruce, Inc. v. Sears, Roebuck & Co.,* 343 F.Supp. 1333, 1340–41 (E.D.Pa.1972) ("GRUBB" closely resembles "NEETS N GRUBS"). At the same time, there are just as many cases that have rejected a finding of confusing similarity between marks that share common words. *See, e.g., Nutri/System, Inc. v. Con–Stan Industries, Inc.,* 809 F.2d 601, 605–6 (9th Cir.1987) ("NUTRI/SYSTEM" is not confusingly similar to "NUTRI–TRIM"); *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir.1993) ("PARENTS" and "PARENT'S DIGEST" are not confusingly similar); *Keebler Co. v. Murray Bakery Prods.,* 866 F.2d 1386, 1390 (Fed.Cir.1989) ("PECAN SHORTEES" sufficiently dissimilar from "PECAN SANDIES"). The different outcomes in these cases can be explained by the fact that a determination of similarity encompasses, in addition to the phonetic and visual comparisons of the actual marks, the overall impression of the marks in the mind of the consumer.

Here, we find that the MIRACLESUIT and THE MIRACLE BRA marks are presented in somewhat of a different fashion. For example, Defendants point to the fact that the MIRACLESUIT mark is often accompanied by a slogan saying: (1) "Look ten pounds lighter in 10 seconds. The ten seconds it takes to slip it on;" (2) "Look ten pounds lighter in 10 seconds!" with a photograph of a model wearing the MIRACLESUIT; and/or (3) on the reverse side of some is the silhouette design and the repeated phrase "Look 10 pounds lighter in 10 seconds." Facts I at ¶ 55; *see also* Defs.' Mem. at 11. In addition, THE MIRACLE BRA is presented in either all capital block letters or in small capital letters with the letters, T, M, B alone in upper capital letters, while the MIRACLESUIT has sometimes been advertised with the initial letter M capitalized and the rest of the mark in lower-case letters in italicized script or as one word with both the M and S capitalized. *See id.* While we recognize that side-by-side comparison

of the conflicting marks is improper if that is not the way buyers see the products in the market, *see McCarthy, supra,* § 23:59, we find that these distinctions in presentation have the overall effect of creating a slight difference between the marks in the mind of the consumer.

On balance, we find that the MIRACLESUIT mark and THE MIRACLE BRA mark are somewhat distinct in sight, sound and meaning.

### b. Use of House Marks

As we examine the conflicting marks in their entirety, we must examine the effect of a house mark on dispelling confusion between the parties' MIRACLESUIT and THE MIRACLE BRA marks. Defendants argue that a house mark will dispel confusion, while Plaintiffs vehemently disagree. *See* Defs.' Mem. at 13–15; Pls.' Mem. at 15. The use of a house mark does not automatically preclude liability; many courts have held that the mere addition of a house mark by a junior user cannot be a defense to infringement. *See, e.g., A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972); *American Home Prods. Corp. v. Johnson Chemical Co., Inc.,* 589 F.2d 103, 107 (2d Cir.1978); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 612 F.Supp. 1081, 1091 (D.C.Il. 1985), *aff'd,* 796 F.2d 903 (7th Cir.1986); *cf. W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970). At the same time, the use of a house mark by a junior user to a possibly infringing mark of a senior user can have the potential to reduce or eliminate a likelihood of confusion. *See McCarthy, supra,* § 23:43; *see also A & H Sportswear III,* 166 F.3d at 195.

We believe that the confusing similarity, if any, between the MIRACLESUIT and THE MIRACLE BRA is significantly diminished by the fact that THE MIRACLE BRA always appears with the Victoria's Secret house mark. A famous house mark as part of the composite can create a distinct and separate impression which diminishes the likelihood of confusion. *See, e.g., Four Seasons Hotels Ltd. v. Koury Corp.,* 776 F.Supp. 240, 247 (E.D.N.C.1991); *Henri's Food Prods. Co., Inc.,* 717 F.2d at 355–56; *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir. 1993); *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968–69 (2d Cir.1981); *Pristine Industries, Inc. v. Hallmark Cards, Inc.,* 753 F.Supp. 140, 144–45 (S.D.N.Y.1990); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 584 (D.N.J.1985); *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1441–42 (S.D.Oh.1990); *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.,* 943 F.Supp. 120, 124 (D.Mass. 1996); *I.P. Lund Trading v. Kohler Co.,* 11 F.Supp.2d 112, 123 (D.Ma.), *aff'd in part and vacated in part,* 163 F.3d 27 (1st Cir.1998). The Victoria's Secret house mark is famous because VS Stores are the nation's top retailer of lingerie and over 300 million VS catalogs are circulated each year.[17] *See* Facts I at ¶¶ 5–6. In August of 1995, Defendants' total sales of THE MIRACLE BRA swimwear products had exceeded $10 million. *See id.* at ¶ 70. The Victoria's Secret housemark is similar in renown to those defendants in the above-cited cases. *See Pristine Industries,* 753 F.Supp. at 146. Moreover, the Victoria's Secret house mark is prominently displayed on the hang-tag and the sewn in label for THE MIRACLE BRA swimwear products, which are only available from VS Stores and the VS Catalogue. *See* Facts I at ¶ 19. The prominent display of a well

---

**17.** While most of the cases discussing the effect of a house mark on diminishing the likelihood of confusion focus on a defendant's house mark, a plaintiff's house mark may also be considered. *See, e.g., Eagle Snacks,* 625 F.Supp. at 584. We note that the MIRACLESUIT line is exclusively distributed and marketed by its division called Swim Shaper. *See* Facts I at ¶¶ 2. The Swim Shaper house mark is not entirely unknown, as Plaintiffs manufacture 10% of the nation's swimwear, with 5% of those emanating from SWIM SHAPER. *See id.* at ¶ 1. The hang-tags bear the words "MIRACLESUIT ™ from SwimShaper." *Id.* at ¶ 3. We therefore believe that the Plaintiffs' housemark with the MIRACLESUIT also helps to create distinct impression from THE MIRACLE BRA.

known house mark is crucial to diminishing the likelihood of confusion. *See, e.g., Vitarroz,* 644 F.2d at 968–69; *Eagle Snacks,* 625 F.Supp. at 584; *Worthington Foods,* 732 F.Supp. at 1417; *W.W.W. Pharmaceutical,* 984 F.2d at 573. Thus, we find that the use of Victoria's Secret housemark with THE MIRACLE BRA mark on swimwear further diminishes the likelihood of confusion between it and the MIRACLESUIT mark.

### c. Effect of a Disclaimer

Finally, VS Catalogue publishes a disclaimer that was first published in the Victoria's Secret's Resort 1997 Catalogue. *See* Facts II at ¶ 23. In evaluating the marks as a consumer would encounter them in the marketplace, *see Fisons,* 30 F.3d at 477, we must also consider the effect of a disclaimer in the catalog. Defendants began to print a disclaimer in the VS Catalogue after we initially found liability under the erroneous "possibility of confusion" standard in our decision dated May 24, 1996. *See* Facts II at ¶¶ 19–26; *A & H Sportswear I,* 926 F.Supp. at 1269.

The disclaimer appeared as follows: "The Miracle Bra swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLESUIT® by Swim Shaper®." Facts II at ¶ 23. Although the positioning varied, the disclaimer often appeared in dark, black type against a light background at the lower left corner of the actual page on which THE MIRA-CLE BRA Swimwear Collection was featured in the catalog, just above the telephone number for placing an order.[18] *See id.* at ¶ 24. The President of VS Catalogue stated that since there are only a few seconds in which to capture a consumer's attention, placement near the telephone number is particularly appropriate. *See id.* at ¶ 21.

Although disclaimers often do not alleviate confusion over brands,[19] we believe that VS Catalogue's disclaimer is effective in informing consumers against confusion between the MIRACLESUIT and THE MIRACLE BRA. *See A & H Sportswear II,* 967 F.Supp. at 1471–72. In particular, the effect of a disclaimer is to create a distinction between the MIRACLESUIT and THE MIRACLE BRA marks. *See Soltex Polymer Corp. v. Fortex Industries, Inc.,* 832 F.2d 1325, 1330 (2d Cir.1987); *Charles of the Ritz Group,* 832 F.2d at 1324; *see also A & H Sportswear IV,* 166 F.3d at 208 ("the District Court fully articulated why it was an appropriate remedy in this case").

Defendants have apparently committed themselves "to continue using the disclaimer, whatever the eventual result in the case." *See A & H Sportswear IV,* 166 F.3d at 208. Thus, solely *based on the presumption* that Defendants will continue to use the disclaimer when marketing THE MIRACLE BRA swimwear, we find that the two marks are not similar.[20] This

---

**18.** In 1997, VS Stores agreed that if it did reintroduce THE MIRACLE BRA swimwear in the future, it would incorporate the aforesaid disclaimer on the product hang-tag. *See* Facts II at ¶ 27. At that time, VS Stores had not marketed THE MIRACLE BRA swimwear in one and a half years and indicated that it did not have any plans to market swimwear in 1997. *See id.*

**19.** Use of a relatively inconspicuous disclaimer will not prevent likely confusion. *See, e.g., University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1547 (11th Cir.1985); *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1276 (S.D.N.Y.1990), *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1551 (S.D.Tex.1996). Moreover, in

cases of substantial confusion, a disclaimer has often been found to be an inadequate remedy. *See Charles of the Ritz Group v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1324 (2d Cir.1987); *Home Box Office v. Showtime/The Movie Channel Inc.,* 832 F.2d 1311, 1316 (2d Cir.1987). The Third Circuit has noted, however, that the disclaimer remedy has been applied in other cases. *See A & H Sportswear IV,* 166 F.3d at 208; *see also Springs Mills, Inc. v. Ultracashmere House, Ltd.,* 724 F.2d 352, 356 (2d Cir.1983); *see also AMF Inc.,* 599 F.2d at 354–55.

**20.** In fact, Defendants are no longer required to utilize the disclaimer because the Third Circuit has vacated our remedy issued on July 1, 1997. *See A & H Sportswear IV,* 166 F.3d

factor, therefore, weighs in favor of the Defendants.

### 3. *Product Similarity and Marketing Channels* (Factors # 3 a # 4)

The Third Circuit has found that the Plaintiffs' MIRACLESUIT and Defendants' THE MIRACLE BRA swimwear are directly competing goods. *See A & H Sportswear IV,* 166 F.3d at 202. For the likelihood of confusion analysis, however, it is significant to understand the degree to which the products overlap in the marketplace. In other words, "[a]mong the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels though which the goods are sold." *See Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 480 (2d Cir.1996). These factors shed light on the conditions of purchase and thereby assist in the determination of whether consumer confusion is likely.

The MIRACLESUIT and THE MIRACLE BRA swimwear have distinctive functions. The MIRACLESUIT offers body control and claims to make the wearer look slimmer, emphasizing horizontal control and vortical stretch. *See* Facts I at ¶¶ 14, 16. In contrast, the primary function of THE MIRACLE BRA swimwear is to provide cleavage enhancement. *See id.* at ¶¶ 33, 41. At the same time, the design of THE MIRACLE BRA and the MIRACLESUIT swimwear share similarities. Both are bathing suits which come in two varieties, either a one-piece suit or bikini. *See id.* at ¶¶ 3, 15, 33. A majority of the MIRACLESUITs contain bras with underwires and some designs have cleavage enhancement in the form of push-up or padded bras. *See id.* at ¶¶ 14, 46, 47. Likewise, THE MIRACLE BRA swimwear's primary function is a cleavage en-

hancement feature via angled underwires, push-up pads, adjustable pads and straps. *See id.* at ¶¶ 15, 47. The MIRACLESUIT offers body control and a few of THE MIRACLE BRA swimwear products have lower torso control or bikini control bottoms. *See id.* at ¶¶ 14, 47. We find, therefore, that the MIRACLESUIT and THE MIRACLE BRA swimwear products could be considered somewhat interchangeable.

The channels in which the products are sold and advertised also overlap. Both the MIRACLESUIT and THE MIRACLE BRA target women nineteen and older who are willing to pay a premium price for a swimsuit. *See id.* at ¶¶ 38–39, 42. The MIRACLESUIT ranges from $54 to $100, *see id.* at ¶¶ 14, 44, while Defendants' one-piece piece costs $69 and a two-piece costs $68. *See id.* at ¶ 15. In the swimsuit industry, a price level of over fifty dollars for swimsuits is considered a single price category. *See id.* at ¶ 44. Finally, both the MIRACLESUIT and THE MIRACLE BRA have been advertised in some of the same forums. *See A & H Sportswear I,* 926 F.Supp. at 1262. Plaintiffs have advertised the MIRACLESUIT via point of sale displays in retail stores, national consumer magazines, cooperative advertising with Plaintiffs' retail customers, distribution of bill enclosures to department stores, and distribution of catalogs and press kits to professional buyers, editors and publishers. *See* Facts I at ¶ 59. THE MIRACLE BRA has similarly been marketed through in-store promotions, press kits, print and television advertisements. *See id.* at ¶¶ 63–64.

We have previously noted that the MIRACLESUIT and THE MIRACLE BRA are sold through similar channels of trade. *See id.* at ¶ 43; *see also A & H Sportswear III,* 166 F.3d at 196. In particular, the

at 207. However, we are making our finding that the marks are dissimilar on the basis that the Defendants will continue to use the disclaimer in a manner as was testified by Ms. Fedus, VS Catalogue's president. *See* Facts II

at ¶¶ 23–24. Moreover, we further presume that if Defendants were to sell THE MIRACLE BRA swimwear in VS Stores, a similar disclaimer would be printed on the hang-tag. *See id.* at 1483.

MIRACLESUIT is sold to department stores and catalogs that compete with VS Stores and VS Catalogue. *See* Facts I at ¶ 43. However, we also note that such channels could be distinguished because Defendants sell THE MIRACLE BRA swimsuits exclusively in VS Stores and the VS Catalogue.[21] *See id.* at ¶ 14. Although it would be hypothetically possible for a customer to see both a MIRACLESUIT swimsuit at a department store and THE MIRACLE BRA swimwear at a VS Store within the same shopping mall, the MIRACLESUIT swimwear has not typically been available in the same store or catalog as THE MIRACLE BRA swimwear. *See id.* at ¶¶ 38, 43.[22] Such fine distinctions between the channels in which the products are sold may weigh in favor of diminishing a likelihood of confusion. *See, e.g., Ivoclar North America v. Dentsply Int'l Inc.,* 41 F.Supp.2d 274, 281 (S.D.N.Y.1998) (products being marketed in different sections of the catalog is one factor in the determination that competing products are sold in different channels of trade); *Graham Webb Int'l v. Helene Curtis Inc.,* 17 F.Supp.2d 919, 929 (D.Minn.1998) (competing hair products are not sold through the same channels because one of the products is exclusively available at professional salons).

On balance, however, we find that the conditions of purchase for both products are similar enough to weigh in favor of the Plaintiffs.

### 4. *Sophistication of Consumers* (Factor # 5)

■ An analogous factor to consider is the sophistication of the purchasers and the degree of care used by consumers. *Cadbury Beverages,* 73 F.3d at 480. The sophistication of the consumer is relevant to the likelihood of confusion analysis, *see Merchant & Evans v. Roosevelt Bldg. Prods.,* 963 F.2d 628, 637 (3d Cir.1992), *overruled on other grounds by, Two Pesos,* 505 U.S. at 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, unless the marks and the products are in all other regards identical. *Compare Banff,* 841 F.2d at 492. In the instant case, however, we will proceed with the sophistication of the consumer analysis because the marks in this case are not identical.

The price of the good and the importance of the use of a product are relevant to a court's determination of the standard of ordinary care exercised by a consumer for a particular product.[23] *See Versa Prods.,* 50 F.3d 189, 204–205. It is presumed that consumers do not use a high degree of care in purchasing inexpensive goods, such as grocery store items. *See, e.g., Specialty Brands, Inc. v. Coffee Bean Distrib., Inc.,* 748 F.2d 669, 672 (Fed.Cir. 1984) (consumers use less care purchasing an inexpensive item such as tea); *Beer Nuts, Inc. v. Clover Club Foods, Co.,* 805 F.2d 920, 926–27 (10th Cir.1986) (buyers typically exercise little care in the selection of inexpensive items such as nuts). On the other hand, a consumer uses more care when making a decision with respect to an expensive and important product. *See, e.g., First Keystone Bank,* 923 F.Supp. at 693 (presumption of care exercised when choosing a mortgage).

The MIRACLESUIT and THE MIRACLE BRA swimwear can neither be considered inexpensive items nor big-ticket

---

**21.** Although we note that in 1997, VS Stores had not marketed THE MIRACLE BRA swimwear in one and a half years and had no plans to introduce it in their stores in 1997. *See* Facts II at ¶ 27.

**22.** One exception is during 1992, when the VS Catalogue had purchased the MIRACLESUIT swimwear for sale in its catalog. *See id.* at ¶ 28.

**23.** While we note that all of Plaintiffs' cited incidents of actual confusion involved professional buyers of the MIRACLESUIT, *see* Facts I at ¶¶ 71–73, we must follow the Third Circuit's rule that in considering a product which is sold to both professionals and consumers, the proper standard is that of the more easily confused ordinary consumer. *See Country Floors,* 930 F.2d at 1066.

items. Both THE MIRACLE BRA and the MIRACLESUIT swimsuits sell for over $50. *See* Facts I at ¶ 44. As stated previously, the MIRACLESUIT targets women "19 to infinity" who can afford to buy a premium product that is "pretty" and "shapes and contours the figure comfortably." *Id.* at ¶ 38. THE MIRACLE BRA is targeted towards women from 18 to 50 who want to enhance their bust and are also willing to pay a premium price for a swimsuit. *See id.* at ¶¶ 39, 42. Buyers of apparel, especially women's apparel, have been previously held to be sophisticated purchasers. *See, e.g., Jordache Enterprises, Inc. v. Hogg Wyld Ltd.,* 625 F.Supp. 48, 53 (D.N.M.1985), *aff'd,* 828 F.2d 1482 (10th Cir.1987) (finding consumer exercise a high degree of care prior to purchasing designer jeans ranging from $15 to $60); *McGregor–Doniger Inc.,* 599 F.2d at 1138 (relevant purchasing group of womens' raincoats ranging from $100 to $900 tends to be sophisticated and knowledgeable); *cf. Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 626 (2d Cir. 1983) (discerning consumers of women's apparel are unlikely to be confused between the "Sally Gee" and "Sally Gee" labels). Indeed, the entire success of both the MIRACLESUIT and THE MIRACLE BRA swimwear relies on the premise that consumers will discern the slimming effect and cleavage enhancement features of their respective swimsuits. *See* Facts I at ¶¶ 16, 33, 41. Plaintiffs have not provided evidence otherwise indicating that consumers of womens' swimwear priced at over $50 are not careful or sophisticated consumers. Moreover, we find that the premium price of both the MIRACLESUIT and THE MIRACLE BRA swimwear lends support to the fact that purchasers of such swimsuits would exercise sufficient care in their buying decisions—negating the probability of confusion between the two products. *Cf. Graham Webb Int'l,* 17 F.Supp.2d at 931 (purchasers of expensive hair and beauty aids are sophisticated buy-

ers). Thus, we find that this factor weighs in favor of the Defendants.

5. *Defendant's Intent* (Factor # 6)

█ The only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse consumers. *McCarthy, supra,* § 23:110; *see also Libman Co. v. Vining Industries, Inc.,* 69 F.3d 1360, 1363 (7th Cir.1995). "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1535 (4th Cir.1984). Intent to confuse consumers can be indicated by the deliberate and unnecessary duplication of a plaintiff's mark "in a way that was calculated to appropriate or otherwise benefit from the good will plaintiff had nurtured." *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970); *see also Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 466 (4th Cir.1996). A showing of a good faith belief that a subsequently-adopted mark will not lead to contusion, however, is never a defense to a finding of infringement based on other factors supporting a likelihood of confusion. *See A & H Sportswear III,* 166 F.3d at 196.

We now find that the Defendants' choice to extend THE MIRACLE BRA mark to swimwear was for legitimate reasons, rather than out of bad faith or deliberate intent. We previously noted in the context of discussing damages that Defendants did not intentionally choose the name MIRACLE for use with bras to ride on the success of MIRACLESUIT swimsuit, but had conceived of their name independently. *See A & H Sportswear II,* 967 F.Supp. at 1471. Moreover, the idea to put THE MIRACLE BRA trademark and the feature of enhanced cleavage into a bikini came from VS Catalogue as a direct result of THE MIRACLE BRA success. *See*

Facts I at ¶ 33.[24] Furthermore, the decision to expand THE MIRACLE BRA mark into swimwear was instinctive on the part of the marketing department. *See id.* at ¶ 42. One of VS Stores' marketing department responsibilities is to "brand extend," which is a way to extend the enhanced cleavage attribute to as many products as possible. *See id.* at ¶ 41. We therefore believe that Defendants conceived of and adopted THE MIRACLE BRA mark independently for lingerie and then extended their mark into swimwear. *See id.* at ¶ 23, 41.

Plaintiffs argue that Defendants intended to confuse consumers by adopting THE MIRACLE BRA mark because Defendants had constructive notice of Plaintiffs' mark in the swimwear industry. When initially registering THE MIRACLE BRA mark for bras, Defendants' trademark counsel found numerous "miracle" trademarks including A & H's MIRACLESUIT.[25] *See id.* at ¶ 24. In the latter half of 1994, VS Stores applied for a trademark registration for THE MIRACLE BRA for "swimsuits, bathing suits and bikinis." *See id.* at ¶ 34. VS Stores had previously performed a search of "miracle" with regards to perfume and related goods but not with respect to swimwear. *See id.* at ¶ 35. Mr. Deckop assumed a trademark search was completed and relied on counsel to provide papers that merely required his review and signature. *See id.* Ms. Nichols, VS Stores' President, also assumed that the search was done for both bras and swimsuits. *See id.* at ¶ 25. However, no one at VS Stores had heard of A & H's MIRACLESUIT nor were aware that VS Catalogue had sold the MIRACLESUIT, prior to the lawsuit. *See id.* at ¶ 26. Plaintiffs filed the lawsuit on December 3, 1994. *See id.* at ¶ 74. On February 27, 1995, the Patent and Trademark Office's examining attorney refused VS Stores' application for registration of THE MIRACLE BRA bikini on the basis of A & H's prior registration of MIRACLESUIT swimwear.[26] *See id.* at ¶ 36.

We believe that the above sequence of events indicates that VS Stores' use of THE MIRACLE BRA mark in connection with swimsuits was not in flagrant disregard of A & H' s prior registration of the MIRACLESUIT.[27] We find it entirely credible that those responsible for extending THE MIRACLE BRA mark to swimwear were unaware of the trademark searches because of a lack of communication between various departments within the VS Store's corporation. At best, this lack of communication was a result of bureaucratic carelessness and was not intentionally done for the purpose of profiting from the notoriety of Plaintiffs' MIRA-

**24.** VS Stores and VS Catalogue are two separate and distinct companies. *See id.* at ¶¶ 9–10.

**25.** Mr. Deckop, Chief Financial Officer of VS, signed the application for registration of THE MIRACLE BRA, without knowledge of the search report. *See id.* Mr. Deckop apparently signed whatever was handed to him by corporate counsel. *See id.* at ¶¶ 25, 35.

**26.** Despite the refusal, VS Store's President stated that the PTO's action had no effect on her decisions concerning the marketing or sale of any of THE MIRACLE BRA products. *See id.* at ¶ 37. While the PTO's adjudication may assist us in deciding whether trademark infringement has occurred, its decision is not binding on this court. *See Driving Force, Inc. v. Manpower, Inc.,* 498 F.Supp. 21, 25

(E.D.Pa.1980); *Syntex Lab., Inc. v. Norwich Pharmacal Co.,* 315 F.Supp. 45, 52 (S.D.N.Y. 1970), *aff'd,* 437 F.2d 566 (2d Cir.1971).

**27.** The existence of notice is not evidence that a later user necessarily intended to confuse. *See McCarthy, supra,* § 23:109. While the use of a mark with knowledge of another's prior use of the mark may support an inference of intentional infringement, a finding under this factor requires a showing that the junior user intended to capitalize on the value of the mark that it did not own, and indeed, that it believed confusion was likely. *See Champions Golf Club, Inc. v. Champions Golf Club, Inc.,* 78 F.3d 1111, 1121 (6th Cir.1996). In the case at bar, even assuming that officials at VS Stores had constructive notice of A & H's registration, we find that Defendants did not intend to capitalize on the value of the MIRACLESUIT mark.

CLESUIT mark. Thus, we find that Plaintiffs have failed to show that the Defendants acted with bad faith or deliberate intent and find that this factor weighs in favor of the Defendants.

### 6. *Actual Confusion* (Factor # 7)

██ A showing of actual confusion is unnecessary to demonstrate that a likelihood of confusion exists between the MIRACLESUIT and THE MIRACLE BRA swimwear. Convincing evidence of actual confusion, however, is strong proof of a likelihood of confusion. *A & H Sportswear IV*, 166 F.3d at 203. Plaintiffs argue that they have proved actual confusion between the MIRACLESUIT and THE MIRACLE BRA swimwear. *See* Pls.' Mem. at 20–21.

██ In particular, Plaintiffs presented evidence at trial of several instances of actual confusion between the parties' marks. *See* Facts I at ¶¶ 71–73. First, Plaintiffs presented employee testimony at trial which included: (1) a visit to Mr. Sacco, a sales agent for Plaintiffs, by a professional swimwear buyer who inquired whether he carried THE MIRACLE BRA swimsuit; (2) a professional swimwear representative familiar with the MIRACLESUIT swimsuit line asked Mr. Sacco whether the MIRACLESUIT company was involved with THE MIRACLE BRA television campaign; (3) a former professional swimwear buyer asked Mr. Sacco whether MIRACLESUIT swimsuits incorporated an enhanced bra which she had heard much about; (4) a buyer called Mr. Sacco to make an appointment to view THE MIRACLE BRA line; (5) one of Plaintiffs' receptionists received a telephone inquiry and a walk-in inquiry concerning THE MIRACLE BRA swimsuits; (6) Plaintiffs' public relations agent thought that the MIRACLESUIT and THE MIRACLE BRA were both made by Plaintiffs; and (7) at a trade show, upon asking buyers whether they were already familiar with the MIRACLESUIT swimsuit, one buyer responded that it made a woman's bust look bigger. *See id.* at ¶¶ 71–72. In addition, Plaintiffs submitted evidence of an article in Women's Wear Daily, referred to "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret Catalog." *Id.* at ¶ 73.[28]

First, we question the reliability of the above instances that involve testimony of employees of the Plaintiffs as to misdirected inquiries or statements. While we accepted such evidence as a finding of fact, we previously noted that:

> [w]hile the incidents testified to probably did occur, their second hand accounting must be carefully scrutinized. The potential to inflict substantial harm on a successful product line by uncorroborated if believable accounts compels us to be vigilant in holding the Plaintiff to its ultimate burden of proof.

*A & H Sportswear I*, 926 F.Supp. at 1262. Courts are generally disinclined to view such employee testimony as reliable and many find it excludable under the rationale that it is hearsay evidence. *See, e.g., Versa Prods.*, 50 F.3d at 212; *Duluth News–Tribune*, 84 F.3d at 1098; *Vitek Systems*, 675 F.2d at 194. We follow the rationale of these decisions by concluding that Plaintiffs' second hand accounting is particularly unreliable "given the lack of opportunity for cross-examination of the caller or sender regarding the reason for the 'confu-

---

**28.** We dismiss the evidence that both the MIRACLESUIT and THE MIRACLE BRA are mentioned in television programs and news articles as indicative of actual confusion as to the products themselves or to the source of the products. *See* Facts I at ¶ 73. In fact, it makes sense that articles would mention the MIRACLESUIT and THE MIRACLE BRA together because both products seek to change the look of the swimsuit wearer in a particular way—either by cleavage enhancement or a slimming effect. Moreover, we note that while one article erroneously assumes that the development of the MIRACLESUIT was preceded by THE MIRACLE BRA concept, *see A & H Sportswear I*, 926 F.Supp. at 1253 n. 6, such a statement similarly does not evidence confusion between the two products.

sion.'" *Duluth News–Tribune,* 84 F.3d at 1098.

Even assuming that such instances of actual confusion did occur, they are clearly de minimis in light of the large volume of sales by the Plaintiffs. Plaintiffs sell 10% of the swimsuits sold annually in the United States of which 4.9% were the MIRACLESUIT in 1995 (approximately 200,000 swimsuits a year).[29] *See* Facts I at ¶¶ 1, 68. Placed against the background of the number of opportunities for confusion, it is not so surprising that isolated evidence of actual confusion exists. However, such evidence is not itself sufficient to establish a likelihood of confusion. *See First Nat'l Bank, Sioux Falls v. First Nat'l Bank, South Dakota,* 153 F.3d 885, 890 (8th Cir. 1998); *see also Nutri/System,* 809 F.2d at 606–607. In fact, courts have found that evidence of a handful of misdirected inquires can be explained by inattentiveness on the part of the caller or sender rather than actual confusion. *See, e.g., Duluth News–Tribune,* 84 F.3d at 1098; *see also McCarthy, supra,* § 23:13. Even believing the uncorroborated accounts of misdirected inquiries cited by the Plaintiffs, such instances of actual confusion are de minimus.

Finally, where evidence of actual confusion is not overwhelming, the gap could be filled by a properly conducted survey indicating actual confusion. *See McCarthy, supra,* § 23:17. We previously found, however, that the evidence of several survey reports conducted by both parties were not of great utility. *See A & H Sportswear I,* 926 F.Supp. at 1256–57. In particular, Plaintiffs' survey expert "assumed that the MIRACLESUIT swimsuit and THE MIRACLE BRA swimsuit would be confused prior to conducting a survey on whether THE MIRACLE BRA and the MIRACLESUIT trademarks in question may cause confusion among consumers."

*Id.* at 1256. We find, therefore, that Plaintiffs have not established that actual confusion exists. This factor weighs in favor of the Defendants.

### 7. Summary of the Factors

■ Considering all of this evidence, we conclude that THE MIRACLE BRA mark does not pose a likelihood of confusion with Plaintiffs' MIRACLESUIT mark as applied to swimwear. The strength of the Plaintiffs' MIRACLESUIT mark (factor # 1), the similarity between the swimwear products (factor # 3) and the overlap of the marketing channels used by both parties (factor # 4), weigh in Plaintiffs' favor. We find that the evidence supporting these few factors, however, are insufficient to support a likelihood of confusion between THE MIRACLE BRA and MIRACLESUIT marks.

Moreover, the degree of similarity between the owner's trademark and the alleged infringing mark is perhaps the most important of all the factors. *See Ford Motor Co.,* 930 F.2d at 297. In the case at bar, we agree that the similarity of the marks (factor # 2) is important and weigh this factor heavily in Defendants' favor. This conclusion is based on the Defendants' continued use of the disclaimer in conjunction with the marketing of THE MIRACLE BRA swimwear as follows:

a. Defendants will publish the disclaimer, "The Miracle Bra™ swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLESUIT® by Swim Shap®" in connection with any promotion, advertising, sale, or identification of such swimwear;

b. The disclaimer shall be published on every page of any catalog spread or magazine advertisement in which a MIRACLE mark appears to identify

---

**29.** We also note that Plaintiffs have not conclusively shown that they have lost sales as a result of Defendants' introduction of THE MIRACLE BRA swimwear. *See* Facts I at ¶ 68. As we noted previously, an increase in sales of the MIRACLESUIT alone does not convince us that sales were not lost to THE MIRACLE BRA swimwear. *See A & H Sportswear I,* 926 F.Supp. at 1261.

swimwear on the same page. The disclaimer shall appear in a reasonable-size type. If Defendants utilize a toll free number at any point in their catalog, such toll free number shall also appear within one half inch of each disclaimer required by this paragraph. Such disclaimer shall appear in a color which clearly distinguishes it from the background on which it is printed;

c. In addition, the Defendants shall publish the same disclaimer in type and size described above on a hang-tag on each piece of swimwear identified by reference to THE MIRACLE BRA or other MIRACLE mark if such products are sold in VS Stores.

See A & H Sportswear II, 967 F.Supp. at 1482–83.[30] Similarly, the sophistication of the consumers of the Plaintiffs' and Defendants' swimwear products (factor # 5), the lack of any evidence of intent on the part of VS Stores or VS Catalogue to confuse consumers (factor # 6) and the lack of substantial evidence of actual confusion of consumers between the two marks (factor # 7), also weigh heavily in Defendants' favor.

We find, therefore, that the factors decisively favor the Defendants. Thus, having failed to establish a likelihood of confusion between THE MIRACLE BRA and MIRACLESUIT marks by a preponderance of the evidence, Plaintiffs are not entitled to relief under a theory of forward confusion.

## B. Reverse Confusion

The Third Circuit has also asked us to consider whether the interaction between the MIRACLE BRA and the MIRACLESUIT in the swimwear market implicates the doctrine of reverse confusion. A & H Sportswear IV, 166 F.3d at 207. As adopted by the Third Circuit:

"Reverse confusion occurs when a larger more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." The result of reverse confusion, which is similar to dilution, "is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."

Id. (citations omitted) (quoting Fisons, 30 F.3d at 474–75). The recognition of the reverse confusion doctrine under Section 43(a) of the Lanham Act and common law trademark infringement is significant:

"The logical consequence of [failing to recognize reverse confusion] would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for that trademark as identification of the second user's products."

Fisons, 30 F.3d at 475(quoting Big O Tire Dealers v. Goodyear Tire & Rubber Co., 408 F.Supp. 1219, 1236 (D.Colo.1976)). As we did not make an explicit finding regarding the applicability of the reverse confusion analysis to Plaintiffs' trademark infringement allegation, see A & H Sportswear I, 926 F.Supp. at 1250, we must do so at this point.

 Reverse confusion exists when a junior user saturates the market with advertising and other publicity of the mark which is disputed as its own. Cf. Illinois High Sch. Ass'n v. GTE Vantage Inc., 99 F.3d 244, 246 (7th Cir.1996). Courts which have chosen to analyze trademark infringement claims under reverse confusion have relied on the fact that a junior user is

---

30. We presume that the Defendants will abide by these specifications as they have committed themselves to the continued use of the disclaimer. See A & H Sportswear IV, 166 F.3d at 208.

a larger and more powerful company "with a well established trade name and with the economic power to advertise extensively." *Fisons*, 30 F.3d at 475; *see also Ameritech, Inc. v. American Info. Tech. Corp.*, 811 F.2d 960, 962 (6th Cir.1987).

■■■ The introduction of Defendants' products under THE MIRACLE BRA mark was accompanied by a large and continuing promotional campaign that made THE MIRACLE BRA a familiar trademark in a relatively short time. *See* Facts I at ¶ 63. Since the launch of THE MIRACLE BRA, VS Stores has expended in excess of $9,295,000 and VS Catalogue has spent $4,000,000 in advertising expenditures. *See id.* at ¶ 67. Several considerations, however, decrease these total figures when calculating Defendants' advertising expenditures specifically used for promoting THE MIRACLE BRA swimwear. First, we presume that the vast majority of the advertising expenditures by VS Stores went to advertising THE MIRACLE BRA lingerie because THE MIRACLE BRA swimwear has been mostly sold through the VS Catalogue.[31] *See id.* at ¶¶ 33–34. Moreover, VS Catalogue spent only a portion of the $4 million towards promoting swimwear with THE MIRACLE BRA mark. *See id.* at ¶ 67.

Defendants argue that all advertising expenditures associated with THE MIRACLE BRA lingerie products should be ignored. *See* Defs.' Mem. 34–36. While such expenditures may seem irrelevant to a trademark infringement case involving only THE MIRACLE BRA swimwear, THE MIRACLE BRA swimwear clearly leverages off the advertising for THE MIRACLE BRA lingerie. Indeed, the impetus for creating the swimwear stemmed from the fact that THE MIRACLE BRA mark has become "so pervasive as to have entered our national consciousness." *A & H Sportswear I*, 926 F.Supp. at 1268. Thus, while we are willing to presume that

Defendants spent substantially less than $13 million in promoting THE MIRACLE BRA swimwear, we estimate that a meaningful portion of the $13 million resulted in promoting THE MIRACLE BRA swimwear.

At the same time, Plaintiffs have also conducted extensive marketing campaigns for their MIRACLESUIT product. As discussed above, Plaintiffs have participated in efforts to advertise the MIRACLESUIT swimsuit in various forums at the cost of approximately $300,000 annually, or a total of $1,244,599. *See* Facts I at ¶ 60; Pls.' Mem. at 2. Such advertising appeared in widely-circulated consumer magazines and trade publications across the country. *See id.* at ¶¶ 50, 60–61. Plaintiffs have also received a substantial amount of free publicity, both print and broadcast, which is estimated at exceeding $1.5 million. *See id.* at ¶ 61. Plaintiffs acknowledge that their publicity campaign was highly successful and that such promotion resulted in effectively increasing public recognition of the MIRACLESUIT product. *See* Pls.' Mem. at 2–3; *see also A & H Sportswear I*, 926 F.Supp. at 1257. While Defendants spent more advertising dollars, both parties expended substantial amounts advertising their products which resulted in increased public recognition for both THE MIRACLE BRA and the MIRACLESUIT swimwear products. *See A & H Sportswear I*, 926 F.Supp. at 1257. In light of Plaintiffs' advertising campaign, we find that, in comparison, Defendants did not saturate the marketplace with its advertising to promote THE MIRACLE BRA swimwear.

Moreover, while Defendants are clearly a large corporation, Plaintiffs' are not entirely without market power in the swimwear industry. Plaintiffs manufacture 10% of the nation's swimwear. *See id.* at ¶ 1. The MIRACLESUIT line in particular is Plaintiffs' most profitable line and repre-

---

**31.** Defendants specifically allege that VS Stores only spent $13,000 on marketing

swimwear under THE MIRACLE BRA name. *See* Defs.' Mem. at 34–35.

sents 10% of its total sales.[32] *See id.* at ¶ 68; Pls.' Mem. at 3. VS Catalogue also has strong market power in the swimwear industry because it circulates over 300 million catalogues, with swimwear as nearly 4–5 percent of VS Catalogue sales. *See* Facts I at ¶¶ 6, 70. THE MIRACLE BRA line of swimwear was roughly 1–2 percent of VS Catalogue sales in 1995. *See id.* at ¶ 70. Thus, we cannot say that Defendants have used their market power to overwhelm Plaintiffs in the swimwear market.[33]

Finally, the disparity of economic power and advertising expenditures in the case at bar does not even begin to approach the disparity that exists in other reverse confusion cases. *See, e.g., Big O Tire Dealers,* 561 F.2d at 1367 (plaintiff has net worth of $200,000 versus defendant who spent $10 million on advertising); *Sands, Taylor & Wood v. Quaker Oats Co.,* 18 U.S.P.Q.2d 1457, 1458, 1474 (N.D.Ill.1990) (plaintiff had $200,000 net worth while defendant spent $365 million to advertise over a six-year period), *aff'd in part and rev'd in part,* 978 F.2d 947 (7th Cir.1992); *Fisons,* 30 F.3d at 470–71 (plaintiff spends nominal amounts on advertising while in its first few months defendant had spent over $500,000 on advertising). Even while no quantitative formula has been determined, courts have implicated the doctrine of reverse confusion in cases where an obvious and apparent difference between the economic power of the junior and senior users existed. *See, e.g., Americana Trading, Inc. v. Russ Berrie Co.,* 966 F.2d 1284, 1287 (9th Cir.1992); *Banff,* 841 F.2d at 487–490. Here, we find that in light of the advertising campaign undertaken by the Plaintiffs, the Defendants have not used

their economic power to overwhelm the market with advertising of THE MIRACLE BRA swimwear. Since the doctrine of reverse confusion is not implicated, we decline to examine whether a likelihood of reverse confusion exists between THE MIRACLE BRA and the MIRACLESUIT marks.

## IV. CONCLUSIONS OF LAW

Consistent with the foregoing discussion and the findings of tact made by this court, *see A & H Sportswear I,* 926 F.Supp. at 1235–54; *A & H Sportswear II,* 967 F.Supp. at 1462–67, we state the following conclusions of law:

1. Plaintiffs have failed to meet their burden of establishing a likelihood of confusion between the MIRACLESUIT and THE MIRACLE BRA swimwear trademarks under the relevant precedent for directly competing goods. *See A & H Sportswear IV,* 166 F.3d at 206. Plaintiffs have failed to meet this burden on the presumption that the disclaimer printed by VS Stores and VS Catalogue will continue to be utilized.

2. Plaintiffs have not met the burden of establishing that the interaction between the MIRACLESUIT and THE MIRACLE BRA swimwear trademarks implicates the doctrine of reverse confusion. *See id.* at 207.

An appropriate order follows.

### ***ORDER***

AND NOW, this 29th day of July, 1999, upon consideration of Plaintiffs' Memorandum Concerning: (1) The Appropriate Analysis and the Relevant Precedent Un-

---

**32.** It is noteworthy that incidents of confusion alleged by the Plaintiffs are mostly incidents of forward confusion. *See* Facts I at ¶¶ 71–73. In other words, these incidents of confusion indicate that consumers are confused into thinking that THE MIRACLE BRA swimsuit is a product made by the Plaintiffs, rather than consumers thinking that the MIRACLESUIT is an item offered by VS Catalogue and VS Stores.

**33.** VS Catalogue sells 40% of the mail-order market for swimwear with THE MIRACLE BRA swimwear comprising one-third of its sales, *see* Facts II at ¶ 11, however, there is no indication in the record as to what share VS has of the total swimwear market.

der the Likelihood of Confusion Standard of the Lanham Act for Directly Competing Goods; and (2) Whether the Interaction Between the Miracle Bra for Swimwear and the Miraclesuit for Swimwear Implicates the Doctrine of Reverse Confusion filed on April 21, 1999 and Victoria's Secret's Memorandum upon Remand Demonstrating No Likelihood of Confusion, Either Forward or Reverse, Exists Between the Miracle Bra and Miraclesuit in the Swimwear Market filed on May 18, 1999, it is hereby ORDERED as follows:

1. We find in favor of Defendants with regard to claims of a likelihood of confusion under forward confusion with respect to the MIRACLE BRA trademark and the MIRACLESUIT trademark as applied to the swimwear market;

2. We find in favor of the Defendants with regard to claims of a likelihood of confusion under the doctrine of reverse confusion with respect to the MIRACLE BRA trademark and the MIRACLESUIT trademark as applied to the swimwear market;

3. Any further request for relief by either party is DENIED. THIS CASE IS CLOSED.