CAPITAL BONDING CORP.

v.

ABC BAIL BONDS, INC. and
Lexington National
Insurance Co.

No. Civ.A. 99–4384.

United States District Court,
E.D. Pennsylvania.

Sept. 30, 1999.

Jeffrey W. Duffy, Stevens & Lee, Reading, PA, for plaintiff Capital Bonding Corp.

Jeffrey L. Eichen, Doylestown, PA, for defendant ABC.

Ronald P. Schiller, Piper and Marbury, Philadelphia, PA, for defendant Lexington.

## MEMORANDUM

DALZELL, District Judge.

A bail bond company has sued a rival for, *inter alia,* trademark infringement, and has filed a motion for a preliminary injunction to stop it. The rival has moved to dismiss.

This memorandum will constitute our findings of fact and conclusions of law under Fed.R.Civ.P. 52(a) as to the preliminary injunction motion. For the reasons that follow, we will deny both motions.

### I. *FACTS*

Plaintiff Capital Bonding Corp. ("Capital") is a Reading-based company that sells bail bonds in much of the country. Until 1997, the firm operated as a sole proprietorship under the name "Vincent J. Smith Bail Bonds". Smith two years ago elected to incorporate his business, to which he was introduced and learned from boyhood at the knee of his grandmother. Together with his wife, Smith owns all of the common stock of Capital.

ABC Bail Bonds, Inc. ("ABC") is a relatively new firm, having been formed by its principal, and current president, Ronald Jacob Yellin, as the sequel to a number of pawn shops and check cashing agencies that Yellin had operated for many years.

Yellin began the bail bond business in 1995 and, like Capital, it has to date proved to be a successful and fast-growing enterprise.

Although Capital operates directly and indirectly in at least thirty states, it is undisputed that it competes with ABC in the counties of Eastern Pennsylvania and throughout New Jersey, where ABC is based in the state capital. Both firms serve the same market, which ranges from lawyers to non-literate, non-English-speaking defendants and their families and friends. Both provide the financial guarantees most people associate with such firms, but both also provide the less commonly thought-of service of, as Yellin put it, "fugitive recovery".[1]

Capital on August 31, 1999 filed this action for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and Pennsylvania law.[2] Capital alleges that the Yellow Pages ads of ABC infringe its "distinctive" logo, which it has registered with the Patent and Trademark Office. Capital's logo consists of a muscular, serious-looking man dressed in tattered prison garb bending apart the bars of a prison cell (the "Capital image").[3] ABC's image features a cartoon prisoner dressed in an old-fashioned prison uniform, gleefully stepping through a hole in a brick wall (the "ABC image").[4]

Capital seeks to preliminarily enjoin ABC from using the ABC image. It also wants ABC to relinquish all of the tele-

---

1. The etymology of *bail* confirms that for centuries it has carried the dual meanings of financial and personal surety. For example, late in Queen Elizabeth I's reign, The Rev. H. Smith preached that "Death would take no baile" and Shakespeare in the same year (1593) wrote in *The Second Part of King Henry the Sixth,* v. i, 111, "Sirrah, call in my sonne to be my bale" and 120, "The sonnes of Yorke shall be their Fathers baile." *See* 1 *Oxford English Dictionary* 886 (2d ed.1989) (definitions 5b and 6).

2. Capital also asserts state-law claims for intentional interference with contractual relations, injury to business reputation, and defamation against both ABC and Lexington

National Insurance Co., the insurance company that authorizes ABC to sell bail bonds. However, for purposes of its motion for a preliminary injunction, we are concerned only with Capital's trademark and unfair competition claims against ABC.

3. Capital's image actually bears the face (though not the body) of its president, Vincent J. Smith.

4. The images of both Capital and ABC are attached as an appendix to this Memorandum, as they appeared in the *Bell Atlantic Yellow Pages* for the Trenton Area in its February 1998 – January 1999 edition (ABC Exh. 7).

phone numbers that it has advertised in connection with the image, relief which would likely put ABC out of business, according to Yellin.[5]

After affording the parties a brief time for expedited discovery, we held a hearing on the preliminary injunction motion on September 27–28, 1999.

## II. Capital's Motion for a Preliminary Injunction

■ When ruling on a motion for a preliminary injunction, we must consider four factors: (1) the likelihood that plaintiff will prevail on the merits at final hearing; (2) the extent to which plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See, e.g., Pappan Enters. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 803 (3d Cir.1998). Because we find that the likelihood that Capital will prevail on its trademark infringement claim is very slim, we need not reach the last two inquiries.

### A. Capital's Likelihood of Success on the Merits

■ To succeed on a claim for trademark infringement,[6] a plaintiff must establish three elements:

1. The mark is valid and legally protectable;
2. The mark is owned by the plaintiff; and
3. The defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.

*See, e.g., Fisons Horticulture, Inc. v. Vigoro Indus.,* 30 F.3d 466, 472 (3d Cir.1994); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 192 (3d Cir.1990).

### 1. Validity and Legal Protectability of the Mark

The first element of a trademark infringement claim—the validity and legal protectability of the mark—is proven where a mark is federally registered and has become "incontestable" under the Lanham Act, 15 U.S.C. § 1065.[7] Because Capital cannot establish that its mark is incontestable (because it has not been in continuous use for five consecutive years), the Capital image is valid and legally protectable only if it has acquired "secondary meaning" or is "inherently distinctive." *See, e.g., Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291 (3d Cir. 1991).

Capital has a certificate of registration for its mark, *see* Compl. exh. B, which is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate," 15 U.S.C. § 1057(b). At the preliminary injunction hearing, however, Capital proffered no actual evidence that would suggest that Capital's image has acquired either secondary meaning or is inherently distinctive.

---

**5.** After the hearing, Capital faxed us a revised proposed form of Order seeking more modest relief. Capital eliminated its request that ABC relinquish its phone numbers, but added a request that we enjoin ABC from using any image that either (1) depicts a person in a striped prisoner's uniform, or (2) depicts a person "in a full-frontal perspective breaking through the bars or wall of a jail or prison."

**6.** Although Capital asserts claims for both trademark infringement and unfair competition, the analysis is the same under both causes of action. For brevity, therefore, we will refer only to Capital's trademark infringement claim.

**7.** A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration. *See* 15 U.S.C. § 1065 (West 1997); *Fisons,* 30 F.3d at 472 n. 7.

### a. *Secondary Meaning*

■ Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Ford,* 930 F.2d at 292 (quoting *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir. 1984)). It is generally established "through extensive advertising which . . . . suggests that the products originate from a single source." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978). A non-exhaustive list of factors that may be relevant to the issue of whether a mark has acquired secondary meaning in the market includes the extent of sales and advertising leading to buyer association, the length and exclusivity of use, the fact of copying, customer surveys and testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion. *See Ford,* 930 F.2d at 292.

■ Capital has produced nothing that would suggest that its image has acquired secondary meaning in the marketplace. To the contrary, the parties have stipulated that Capital has only been in existence since January of 1997 and only began using its image in July of 1997, just slightly more than two years ago.[8] Capital has offered nothing to show that its image has achieved secondary meaning in that brief period of time; to the contrary, its president testified at the hearing that Capital actually stopped using the logo in the Yellow Pages, although it is undisputed that such advertising is an important source of business in the bail bond industry. *Cf. Guardian Life Ins. Co. v. American Guardian Life Assurance Co.,* 943 F.Supp. 509, 525 (E.D.Pa.1996) (noting that "[s]econdary meaning exists where the term has been used for so long, or advertised so extensively, that the public

immediately associates the term with one particular enterprise").

A lack of "exclusivity of use" also suggests that the Capital image has not acquired secondary meaning in the marketplace. Smith acknowledged on cross-examination that two other bail bond companies are using Capital's exact image without permission. Also, ABC provided the Court with copies of ads of bail bond companies across the country that feature some sort of a prisoner breaking out of some form of a jail.

We therefore find that Capital is unlikely to prevail on its contention that its image has acquired secondary meaning in the marketplace.

### b. *Inherently Distinctive*

■ We also find that Capital is not likely to prove that its image is "inherently distinctive." The Supreme Court has held that marks are classified into categories of increasing distinctiveness:

(1) *Generic:* Those that "refer to the genus of which the particular product is a species," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985);

(2) *Descriptive:* Those that merely describe the product or a feature of it;

(3) *Suggestive:* Those that suggest a quality or ingredient of goods;

(4) *Arbitrary:* "[T]hose words, symbols, pictures, etc, which are in common linguistic use but.which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Ford,* 930 F.2d at 292 n. 18 (quoting *McCarthy on Trademarks and Unfair Competition* § 11:4);

(5) *Fanciful:* "Fanciful" marks "consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark% Y(4)27 Marks

---

8. As noted above, at least until sometime in 1997, Capital did business as Vincent J. Smith Bail Bonds, a sole proprietorship. Yellow

Page ads with the old name were in circulation at least through January of 1998.

such as 'letters, numbers, product and container shapes, and designs and pictures may also be classed as 'fanciful.' " *Id.*

*See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Our Court of Appeals has noted that these categories are separated by only "the finest of lines." *Dranoff-Perlstein Assocs. v. Sklar,* 967 F.2d 852, 855 (3d Cir.1992) (footnote omitted).

The latter three categories are inherently distinctive and entitled to protection because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. Generic marks, on the other hand, are not entitled to protection, even if they somehow have acquired secondary meaning. *See id.* Descriptive marks are entitled to protection only if they have achieved secondary meaning in the marketplace. *See id.* at 769, 112 S.Ct. 2753.

Capital's mark falls somewhere between generic and descriptive.[9] The Capital image at most describes the service that Capital provides to its customers. With all due respect to the Capital and ABC images,[10] there is nothing unusual or particularly creative about a bail bond agency depicting in its ads a prisoner breaking out of jail. As ABC notes in its brief, such an image is "no more fanciful or suggestive of the services being offered by a bail bond company than an illustration of a pair of scissors is for a barber shop." ABC's Br. at 13.

The number of bail bond companies across the country who use similar illustrations in their advertisements suggests that the mark is far from distinctive. *See* ABC Exh. 6 (a collection of advertisements from outside the Pennsylvania/New Jersey area that feature variations on the theme of a prisoner breaking out of jail). With so many different companies from all parts of the country using similarly themed marks, it seems that the Capital image is, at most, descriptive.

Because we found *supra* that Capital is unlikely to prevail on an argument that its image has acquired secondary meaning in the marketplace, and because a mark which is merely descriptive is not legally protectable without proof of such secondary meaning, we conclude that Capital is unlikely to prevail on the first element its trademark infringement claim. Capital is therefore not entitled to the preliminary injunctive relief it seeks.

*2. Likelihood of Confusion*[11]

Even if we were to conclude that Capital could establish the validity and legal protectability of its mark, we still would deny preliminary injunctive relief because of the slim odds that Capital will ultimately be able to make out the third element of its claim, a likelihood of confusion.

In *Country Floors v. Partnership of Gepner & Ford,* 930 F.2d 1056, 1063 (3d Cir.1991), our Court of Appeals stated that, to establish liability for trademark infringement, the marks must be "confusingly similar." Likelihood of confusion ex-

9. The characterization of a mark is a factual issue for the jury. *See Ford,* 930 F.2d at 292 n. 18; *Members First Fed. Credit Union v. Members 1st Fed. Credit Union,* 54 F.Supp.2d 393, 403 (M.D.Pa.1999). As we are finder of fact on a preliminary injunction motion, this task in this posture therefore falls on us.

10. Neither image is the fruit of a long or expensive gestation. ABC's Exhibit 15, for example, shows the development of its cartoon image by Don Hoffman, an ABC employee who apparently doodles with art on the

side. Capital's image, according to Smith, was his idea but crafted by Denny Boyer, said to be a "sign man" at Signature Sign in Berks County, Pennsylvania.

11. Because Capital has registered its image, it has satisfied the second element of a Lanham Act claim, ownership. *See, e.g., First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.,* 923 F.Supp. 693, 703 (E.D.Pa.1996). Because we conclude that Capital's claim fails on the first and third elements, however, this success is of little moment.

ists "when the consumers viewing the mark would probably assume that the . . . service it represents is associated with the source of a different . . . service identified by a similar mark." *Ford*, 930 F.2d at 292. See also *McLean v. Fleming*, 96 U.S. 245, 251, 24 L.Ed. 828 (1878), where the Supreme Court stated that:

What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trademark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled.

Because Capital and ABC deal in competing services,[12] we need only compare the Capital image with the ABC image and determine whether the marks are confusingly similar. *See, e.g., Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983) ("Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself.").[13]

Our Court of Appeals has not identified a list of factors a court should consider in cases involving directly competing goods. However, in *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F.Supp.2d 155, 163–64 (E.D.Pa.1999) (opinion on remand from 166 F.3d 197 (3d Cir.1999)), our colleague, Judge Van Antwerpen, provided a nonexhaustive list of factors used to determine the likelihood of confusion between competing products:

(1) The strength of plaintiff's mark;

(2) The similarity between the marks;

(3) The similarity of products and the degree to which they directly compete with each other;

(4) The marketing or advertising channels used;

(5) The sophistication of consumers;

(6) The defendant's intent in selecting the mark, and

(7) Incidents of actual confusion.

Judge Van Antwerpen noted that no single factor is dispositive, that a finding of likelihood of confusion does not require a positive finding on a majority of these factors, and that courts are free to consider other, unenumerated factors. *See id.* Taking his seven factors, we find none supports a finding of likely confusion.

a. *Strength of Capital's Mark*

With respect to the first element—the strength of the plaintiff's mark—Smith testified at the hearing that he has only been doing business as Capital Bonding Corporation since January of 1997 and only began using the image in July of 1997, just over two years ago and about the same length of time that ABC has been using its mark. The Capital image appeared in area Yellow Pages for not much more than a year. This brief period of use,[14] combined with the nondistinctive nature of the mark discussed *supra* and the lack of any evidence to suggest that Capital's mark enjoys any significant market recognition whatsoever, suggests that Capital's mark is without any great strength in the marketplace. *See, e.g., Fisons*, 30 F.3d at 478–79 (holding that the strength of a mark is determined by looking at the

---

**12.** The parties agreed in open court on September 28, 1999 that they are competitors, and the record leaves no doubt on this point, at least in Eastern Pennsylvania and all of New Jersey.

**13.** If Capital and ABC were not competitors, we would look beyond the trademark to the nature of the services they provide and the context in which they are marketed and sold. *See Interpace*, 721 F.2d at 462. Our Court of Appeals has outlined a ten-factor test to be

used in that situation. *See, e.g., Ford*, 930 F.2d at 293; *Scott Paper Co.*, 589 F.2d at 1229.

**14.** To be sure, Capital still uses the logo in its mailings to inmates and handouts in high-crime neighborhoods. It is clear, however, that, starting this year, there is no longer the kind of head-to-head competition shown in the attachment from the Yellow Pages in 1998.

mark's distinctiveness, commercial strength, or marketplace recognition).

### b. *Similarity of the Marks*

The second element—the similarity of the marks—weighs strongly against Capital's chances of eventual success on the merits. Even a cursory examination of the Capital and ABC images reveals that they have little in common beyond the most general motif of a prisoner escaping from confinement. Capital's mark features a big, muscular, serious-looking man wearing a prison uniform with vertical stripes and ripped sleeves; by contrast, ABC's mark features a cartoon prisoner wearing an old-fashioned uniform with horizontal stripes. Capital's image bears the face of its president, Vincent J. Smith, but ABC's is a pure artist's creation.[15] And Capital's prisoner is bending apart the bars of his cell, where ABC's inmate steps through a hole in a brick wall, holding a scrap of paper (presumably his ticket to freedom, his ABC bail bond).[16]

The overall result is that the two images look and feel completely different. There is little chance that a potential customer would confuse or associate the two marks, especially since the ads of both parties prominently feature the company name and telephone numbers. Our Court of Appeals has stated that the test for determining the similarity of marks is "whether the[y] create the same overall impression when viewed separately." *Fisons*, 30 F.3d at 477 (citations omitted). We conclude that they do not.

### c. *Marketing and Advertising Channels Used*

Also relevant to our inquiry are the marketing or advertising channels the parties use. Capital and ABC stipulated that Capital has abandoned its use of the Capital image in Yellow Page advertising in the past year,[17] opting instead to focus on direct-mail marketing and street-level distribution of handbills in targeted neighborhoods. ABC, on the other hand, advertises almost exclusively in the Yellow Pages.[18] The fact that the parties employ such different marketing channels dramatically reduces the risk of any confusion.

### d. *Sophistication of Consumers*

The consumers' sophistication level is another factor in our likelihood of confusion analysis. The price and importance of a good or service are relevant to the level of care that a typical consumer will exercise in respect to his purchase of the good or service. *See, e.g., A & H Sportswear*, 57 F.Supp.2d 155, 171–72 ("It is presumed that consumers do not use a high degree of care in purchasing inexpensive goods, such as grocery store items . . . . [but] use more care when making a decision with respect to an expensive and important product.").

As noted in the introduction, consumers of bail bond firms range in sophistication from referring lawyers to the illiterate. Even among the less educated, however, Yellin, ABC's president, testified that twenty-five to thirty percent of the calls his agency receives are from customers

---

**15.** As we mentioned in note 10 *supra*, we learned at the hearing that Don Hoffman, an employee on ABC's night shift, designed the ABC image.

**16.** While our Court of Appeals has held that the similarity of marks is not to be judged on a point-by-point comparison, we find it worthwhile to note some of the specific differences in the images. *See A & H Sportswear Co.*, 57 F.Supp.2d 155 at 166–67 ("While we recognize that the dissection of the marks is generally improper, 'it is not a violation of the anti-dissection rule to view the component parts of conflicting composite marks as a preliminary step on the way to an ultimate deter-

mination of probable customer reaction to the conflicting composites as a whole' " (quoting *McCarthy on Trademarks and Unfair Competition* § 23:41 (4th ed.1996.)))

**17.** In fact, the parties stipulated that Capital has almost completely stopped advertising in the Yellow Pages altogether. *See also* ABC Exh. 3 (a map showing the Pennsylvania and New Jersey markets in which Capital has either no Yellow Page ad or only a text-only ad).

**18.** A minor part of ABC's marketing are giveaways such as tee shirts, mouse pads, and other *tsatskes* bearing the ABC image.

shopping around for the best deal. According to Yellin, bail bond consumers comparison shop, looking for the best price, lowest down payment, and/or quickest release from custody. Based on this direct evidence of consumer sophistication, plus the expense and importance of a bail bond to the prisoner or those acting on the inmate's behalf, we find that potential customers of both Capital and ABC would likely exercise sufficient care in their purchase to negate the probability of confusion.

### e. ABC's Intent in Adopting the Mark

The sixth *A & H Sportswear* consideration is the defendant's intent in adopting the mark. "The only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse consumers." *Id.* at 172. Such intent is strong evidence of likelihood of confusion because "one intending to profit from another's reputation generally attempts to make his ... advertisements ... resemble the other's so as deliberately to induce confusion." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir.1984).

Here, there is no evidence to suggest that ABC had any sort of nefarious intent when it adopted its image, nor that it was even aware of the Capital image when Don Hoffman crafted it in July of 1997. Furthermore, the dissimilarity of the images (discussed above) suggests that ABC was not interested in "copying" Capital's mark in an attempt to profit from Capital's good name.

### f. Incidence of Actual Confusion

The final *A & H Sportswear* factor that is relevant to our inquiry is the evidence of actual consumer confusion. Convincing evidence of customer confusion is strong proof of a likelihood of confusion. *See, e.g., A & H Sportswear Inc. v. Victoria's Secret Stores*, 166 F.3d 197, 203 (3d Cir. 1999).

At the hearing, Capital presented two witnesses who testified that they themselves were "actually confused" by ABC's image or knew of others who were. James Landron, who testified that he has been referring people to Vincent J. Smith since the late 1980s, stated that in 1999 he directed a Spanish-speaking friend to look in the Hispanic Yellow Pages for "the picture of the guy breaking out of jail." His friend, however, mistakenly called ABC instead of Capital.

Even if we accept everything Landron testified to as true, his testimony does not help Capital's case. First of all, it is undisputed that Capital's logo does not appear in the 1999 edition of the Hispanic Yellow Pages. Thus, Landron's instructions could not possibly have led his friend to Capital, regardless of how similar or dissimilar ABC's image is to Capital's. Also, Landron never mentioned the name "Capital" to his friend; instead, he told his friend to call "Vincent Smith." And although Landron knew Capital's telephone number, he did not offer it to his friend. Thus, if Landron's friend was confused, it was because of Landron's confusing directions, not because of ABC's allegedly confusing image.

Capital's other "confusion" witness, Christopher Whalen, is just as unhelpful to its case. Whalen testified that a friend of his referred him to Capital and told him to look for "the picture of the guy breaking out of jail." Whalen then went to the Yellow Pages, looked up bail bonds, and, when he saw ABC's ad and image, called ABC.[19] While he was on the phone with ABC, he turned the page of the telephone directory, saw Capital's text ad, and immediately realized his mistake. Whalen admitted on cross-examination that his confusion may have stemmed from the fact that he didn't turn the page of the directory, which would have revealed Capital's ad.

We find this evidence of actual confusion insufficient at best, even at the preliminary injunction stage. While we recognize that Capital has not yet had an opportunity for full discovery, it did not show actual confusion at the hearing.

---

**19.** Whalen testified that ABC informed him over the telephone that they were not Capital.

### g. Capital's Lack of Enforcement Against Others

A final factor that is relevant to our inquiry is Capital's lack of enforcement against other bail bond companies that have used its *exact image* without a license to do so.

Smith acknowledged on cross-examination that the Ira Judelson bail bond agency, in its ad in the Brooklyn Yellow Pages, and the Montgomery R. Carlin Co., in its ad in the Albany Yellow Pages, are using his exact image without permission. Smith never asked either bondsman to stop using the image and never demanded that either obtain a license from him. Smith's lack of vigilance with respect to companies actually pirating his image suggests that preliminary injunctive relief is unnecessary here.

\*   \*   \*   \*   \*   \*

Based on the combination of the factors discussed above, we find that Capital is unlikely to be able to establish a likelihood of confusion and is therefore unlikely to succeed on its claim for trademark in-

fringement. Thus, we will deny Capital's motion without addressing the remaining preliminary injunction elements.

### III. ABC's Motion to Dismiss

ABC has moved to dismiss Capital's complaint under Fed.R.Civ.P. 12(b)(6) because (1) Capital delayed more than two years in bringing its claim, (2) its illustration is descriptive and has no secondary meaning, and (3) it has not shown any likelihood of confusion. At this stage of the proceedings, however, we are required to accept everything alleged in the complaint as true.[20] Because Capital has made the necessary allegations in its complaint, *see, e.g.,* Compl. ¶ 19 ("In March, 1999, Capital became aware that ABC was advertising its services to the general public by using an image ... substantially and confusingly similar to the Capital Image."); *id.* ¶ 9 ("On July 1, 1997, Capital began to use a distinctive image ... to advertise its bail bond services to the general public."); *id.* ¶¶ 27, 28 (alleging actual consumer confusion), we cannot dismiss its complaint at this early stage.

An Order follows.

---

**20.** When ruling on a motion to dismiss under Rule 12(b)(6), we are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See, e.g., Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). We may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

B 74 BAIL     AREA CODE 609 UNLESS OTHERWISE SHOWN     TRN 47862 © Bell Atlantic

**CAPITAL BONDING CORPORATION**
THE NATION'S LARGEST RETAILER OF BAIL BONDS

PICK UP THE PHONE FOR FREEDOM 800-233-9894

*Serving All 50 States*
*Criminal & Immigration Court Bonds*
*24-hr -- 365 days per year service*

**SE HABLA ESPANOL!**
Call
**TOLL FREE 800-233-9894**

*Conveniently located downtown near all court and correctional facilities*

**NEW JERSEY OFFICES**
*(Collect Calls Accepted)*

Atlantic City    10-12 New York Ave    (609)347-6502
Camden Office   444 Broadway          (609)635-0600
Passaic Office  939 Main Avenue       (973)779-8018

**ABC BAIL BONDS**
Attorney Referrals · We Are Local & Fast · We Make Housecalls · EZ Payment Plans · Se Habla Español · Free Advice

**"CALL ABC FIRST...GET OUT FAST!"**
24 HOURS / 7 DAYS · WE NEVER CLOSE
MUNICIPAL · COUNTY · FEDERAL
EZ PAYMENT PLANS · COLLATERAL NOT ALWAYS NEEDED
SERVING ALL NEW JERSEY COURTS AND ALL 50 STATES
**800-611-BAIL**          **609-777-5525**
CALL TOLL FREE (2245)        CALL COLLECT
190 S. Broad St Trenton (Located Across From the Church By the New Court House)

*ORDER*

AND NOW, this 30th day of September, 1999, upon consideration of plaintiff's motion for a preliminary injunction and the response thereto by defendant ABC Bail Bonds, Inc., and after a hearing on that motion, and upon consideration of ABC's motion to dismiss and plaintiff's brief in reply, and for the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that both motions are DENIED.